UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHRISTINA ROBINS, individually and on behalf of all others similarly situated,<br><br>                  Plaintiff,<br><br>   v.<br><br>LEMME INC., a Delaware corporation,<br><br>                  Defendant. | Case No. 1:25-cv-01938<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Christina Robins brings this action on behalf of herself and all others similarly situated against Lemme Inc., a Delaware corporation ("Lemme" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of her counsel and based upon information and belief, except as to the allegations specifically pertaining to the Plaintiff, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Glucagon-like peptide-1 (GLP-1) agonists are a class of medications designed to treat type-2 diabetes that have shown themselves to also be extremely effective in helping people lose weight. GLP-1 agonists like semaglutide (Ozempic, Wegovy, Rybelsus) and dual GLP-1/GIP (glucose-dependent insulinotropic polypeptide) agonists like tirzepatide (Mounjaro, Zepbound) have become hugely popular as a result of their effectiveness.

2. GLP-1 is a hormone made in the small intestine and the nucleus of the solitary tract (a region of the brain) that triggers the release of insulin from the pancreas (lowering blood sugar), blocks the release of glucose into the bloodstream, slows stomach emptying, and increases feelings of satiety.

3. Yet GLP-1 has a half-life of just 1–2 minutes, as it is quickly degraded by enzymes in the body. As a result, no clinical data supports the notion that simply boosting the amount of naturally occurring GLP-1 in the body has sustained weight loss effects.

4. What makes GLP-1 agonists so effective compared to naturally occurring GLP-1 is that the amino acid sequence of GLP-1 has been modified to make the agonists resistant to being broken down by the enzymes that break down GLP-1. Semaglutide, for example, has a half-life of about 7 days when administered by injection—which is why people who take Ozempic or Wegovy take weekly injections—as opposed to 1–2 minutes.

5. Given the effectiveness of GLP-1 agonists, the market has skyrocketed in recent years. The worldwide market in 2024 is estimated to have been more than $25 billion, and the market is estimated to rise to between $50 billion and $133 billion worldwide by 2030.

6. Yet GLP-1 agonists are very expensive, and for those whose insurance will not cover the drugs, they are often cost-prohibitive.

7. Enter Lemme, a supplement brand founded by Simon Huck and Kourtney Kardashian Barker, hoping to cash in on the GLP-1 agonist craze and swindle Americans into buying their supplements instead.

8. On their website lemmelive.com, Defendant markets and sells "Lemme GLP-1 Daily™" capsules. In truth, they are just extracts of lemon, orange, and saffron.

9. Defendant claims that clinical studies show that the lemon extract (trademarked "Eriomin") increases the amount of naturally occurring GLP-1 in the body by 17 percent. They call GLP-1 the "un-hunger" hormone and tout the "power of GLP-1" in slowing digestion and managing hunger and claim that their supplement "promote[s] your body's GLP-1 production." "[F]actors like age, lifestyle, and diet can affect your body's ability to produce GLP-1. That's where we come in":



10.     Lemme further claims that "[b]oosting GLP-1 levels in the body" using Lemme GLP-1 Daily "comes with a range of health benefits" including "healthy weight loss":



11. These advertisements falsely claim that supplementing naturally occurring GLP-1 using Lemme GLP-1 Daily reduces hunger and causes weight loss. Even if the studies upon which Defendant relies were not flawed (among other reasons, they rely on sample sizes that are far too small to derive valid statistical conclusions), they have no clinical evidence that increasing the amount of GLP-1 in the body by 17 percent has any impact on "un-hunger." "If it were that simple, the pharmaceutical industry wouldn't have spent decades developing stable GLP-1 analogs as the natural form breaks down too fast in the body to be effective."[1]

12. To the contrary, the studies show that after taking Eriomin for four months, participants failed to show any decrease in body weight, body-mass index (BMI), or waist/hip ratio. The authors of the 2019 study upon which Defendant relies made this clear in their analyses, reporting that "[s]upplementation with Eriomin (200, 400, and 800 mg/day) and placebo had no effect on body weight, BMI, lean mass, fat mass, fat percentage, and hip waist ratio."[2] The 2022 study similarly reported that "[s]upplementation with Eriomin had no effect on blood pressure (systolic and diastolic), body weight, BMI, lean mass, fat mass, and ratio hip/waist."[3]

---

[1] Munoz, Nini, and Nirenberg, Edward, "ABCDEFG . . . LEMME Unravel Kourtney Kardashian's Latest Supplement Fad," https://techingitapart.substack.com/p/abcdefg-lemme-unravel-kourtney-kardashians? utm_source=profile&utm_medium=reader2.

[2] Ribeiro C.B., Ramos F.M., Manthey J.A., Cesar T.B., "Effectiveness of Eriomin in managing hyperglycemia and reversal of prediabetes condition: A double-blind, randomized, controlled study," 7 Phytotherapy Res. 11 (June 11, 2019), 1921–1933.

[3] Cesar T.B., Ramos F.M., & Ribeiro C.B., "Nutraceutical Eriocitrin (Eriomin) Reduces Hyperglycemia by Increasing Glucagon-Like Peptide 1 and Downregulates Systemic Inflammation: A Crossover-Randomized Clinical Trial," 25 J. of Medicinal Food 11 (Nov. 9, 2022), 1050–1058 (emphasis added).

13. The lack of change in body weight, BMI, and waist/hip ratio can be seen in the tables below from the two studies:[4]

Table 5.

Hemodynamic and Anthropometric Parameters of Prediabetic Volunteers Submitted to Eriomin (200 mg/d) or Placebo for 12 Weeks

| Variables | Placebo | | Eriomin | |
|---|---|---|---|---|
| | 0 Week | 12° Week | 0 Week | 12° Week |
| Systolic blood pressure, mmHg | 121 ± 13 | 123 ± 19 | 102 ± 25 | 102 ± 26 |
| | *−0.7%* | | *0.2%* | |
| Diastolic blood pressure, mmHg | 76.0 ± 10.4 | 77.3 ± 8.7 | 76.0 ± 10.4 | 75.0 ± 11.1 |
| | *1.8%* | | *1.5%* | |
| Body weight, kg | 99.6 ± 23.1 | 98.9 ± 23.1 | 102 ± 25 | 102 ± 26 |
| | *−0.7%* | | *0.0%* | |
| BMI, kg/m² | 34.5 ± 6.5 | 34.5 ± 6.7 | 34.5 ± 7.1 | 34.5 ± 7.3 |
| | *−0.3%* | | *−0.2%* | |
| Lean mass, kg | 34.5 ± 7.3 | 34.7 ± 7.4 | 34.9 ± 6.7 | 34.9 ± 7.3 |
| | *0.5%* | | *0.2%* | |
| Fat mass, kg | 37.7 ± 8.9 | 38.3 ± 15.6 | 40.1 ± 17.8 | 39.3 ± 18.6 |
| | *−1.6%* | | *−1.8%* | |
| Ratio waist/hip | 1.05 ± 0.10 | 1.05 ± 0.09 | 1.06 ± 0.08 | 1.06 ± 0.09 |
| | *0.1%* | | *0.6%* | |

---

[4] Cesar T.B., Ramos F.M., & Ribeiro C.B., "Nutraceutical Eriocitrin (Eriomin) Reduces Hyperglycemia by Increasing Glucagon-Like Peptide 1 and Downregulates Systemic Inflammation: A Crossover-Randomized Clinical Trial," 25 J. of Medicinal Food 11 (Nov. 9, 2022), 1050–1058 (emphasis added); Ribeiro C.B., Ramos F.M., Manthey J.A., Cesar T.B., "Effectiveness of Eriomin in managing hyperglycemia and reversal of prediabetes condition: A double-blind, randomized, controlled study," 7 Phytotherapy Res. 11 (June 11, 2019), 1921–1933. Several rows of the second table have been removed so it can fit on one page.

Table 5.

Anthropometry and blood pressure of individuals with prediabetic subject to supplementation with 200, 400, or 800 mg/day for 12 weeks

| Variables | Period | Eriomin | | | |
|---|---|---|---|---|---|
| | week | Placebo | 200 | 400 | 800 |
| Body weight (kg) | 0 | 95.3 ± 24.5 | 96.0 ± 22.0 | 95.9 ± 18.8 | 96.0 ± 20.9 |
| | 4 | 95.3 ± 24.6 | 96.0 ± 22.0 | 95.7 ± 19.1 | 96.0 ± 21.6 |
| | 8 | 95.2 ± 24.8 | 96.1 ± 21.7 | 95.8 ± 19.2 | 95.7 ± 21.7 |
| | 12 | 95.5 ± 24.3 | 96.1 ± 22.1 | 95.7 ± 19.1 | 95.8 ± 22.0 |
| | $\delta$ (12-0 week) | 0.2% | 0.1% -0.1% | -0.2% | -0.2% |
| BMI (kg/m$^2$) | 0 | 34.2 ± 7.5 | 34.3 ± 7.1 | 33.9 ± 6.6 | 34.0 ± 7.0 |
| | 4 | 34.4 ± 7.4 | 34.3 ± 7.1 | 33.7 ± 6.8 | 34.0 ± 7.2 |
| | 8 | 34.2 ± 7.6 | 34.3 ± 7.1 | 33.8 ± 6.7 | 33.9 ± 7.2 |
| | 12 | 34.5 ± 6.7 | 34.2 ± 6.2 | 33.7 ± 6.9 | 34.2 ± 7.1 |
| | $\delta$ (12-0 week) | 0.9% | 0.3% 0.3% | -0.6% | 0.6% |
| Lean mass (kg) | 0 | 32.3 ± 6.7 | 32.1 ± 6.2 | 31.8 ± 5.5 | 32.0 ± 6.9 |
| | 4 | 32.2 ± 7.2 | 32.4 ± 6.1 | 32.0 ± 5.8 | 32.0 ± 7.3 |
| | 8 | 31.9 ± 7.2 | 32.2 ± 6.2 | 32.0 ± 5.8 | 31.9 ± 7.3 |
| | 12 | 32.4 ± 7.1 | 32.4 ± 6.4 | 32.0 ± 5.6 | 31.9 ± 7.4 |
| | $\delta$ (12-0 week) | 0.3% | 0.9% 0.4% | 0.6% | -0.3% |
| Fat mass (kg) | 0 | 38.7 ± 15.6 | 38.5 ± 16.8 | 37.8 ± 15.4 | 39.0 ± 14.3 |
| | 4 | 38.8 ± 15.1 | 38.2 ± 17.0 | 37.4 ± 15.6 | 38.8 ± 14.7 |
| | 8 | 38.8 ± 15.1 | 38.5 ± 16.8 | 37.3 ± 15.6 | 38.0 ± 15.2 |
| | 12 | 38.9 ± 15.2 | 38.2 ± 16.9 | 37.3 ± 15.5 | 38.0 ± 15.4 |
| | $\delta$ (12-0 week) | 0.5 | -0.8% -1.6% | -1.3% | -2.6% |
| Body fat (%) | 0 | 39.0 ± 9.3 | 38.9 ± 9.9 | 38.8 ± 10.7 | 39.6 ± 8.8 |
| | 4 | 39.1 ± 8.8 | 38.7 ± 10.2 | 38.7 ± 11.1 | 38.9 ± 9.1 |
| | 8 | 39.6 ± 8.4 | 38.9 ± 10.0 | 38.5 ± 11.2 | 38.8 ± 9.5 |
| | 12 | 39.7 ± 8.5 | 38.5 ± 9.9 | 38.6 ± 10.8 | 38.7 ± 9.7 |
| | $\delta$ (12-0 week) | 1.8% | -1.0% -1.3% | -0.5% | -2.3% |
| Ratio waist/hip | 0 | 1.06 ± 0.15 | 1.05 ± 0.10 | 1.06 ± 0.11 | 1.06 ± 0.17 |
| | 4 | 1.06 ± 0.19 | 1.05 ± 0.10 | 1.05 ± 0.12 | 1.05 ± 0.17 |
| | 8 | 1.06 ± 0.19 | 1.05 ± 0.10 | 1.05 ± 0.12 | 1.05 ± 0.18 |
| | 12 | 1.06 ± 0.12 | 1.05 ± 0.10 | 1.05 ± 0.10 | 1.05 ± 0.12 |
| | $\delta$ (12-0 week) | 0.0% | 0.0% -0.6% | -0.9% | -0.9% |

6

14.     These tables show no change in body weight, BMI, or waist-hip ratio over the 12-week period that was analyzed, regardless of the dose of Eriomin:[5]



15.     The number of calories consumed did not change in the 12-week period either:[6]

Table 6.

Dietary parameters of individuals with prediabetic subject to supplementation with 200, 400, or 800 mg/day for 12 weeks

| Variables | Period | Eriomin | | | |
|---|---|---|---|---|---|
| | Week | Placebo | 200 | 400 | 800 |
| Energy (Kcal) | 0 | 1820 ± 242 | 1879 ± 214 | 1769 ± 174 | 1840 ± 270 |
| | 4 | 1815 ± 264 | 1893 ± 223 | 1771 ± 182 | 1832 ± 257 |
| | 8 | 1817 ± 240 | 1881 ± 229 | 1772 ± 192 | 1840 ± 260 |
| | 12 | 1829 ± 294 | 1873 ± 240 | 1768 ± 184 | 1845 ± 255 |
| | $\delta$ (12–0 week) | 0.7% † | −0.3% † | −0.05% † | 0.2% † |
| | | | −0.18% †† | | |

---

[5] Munoz, Nini, and Nirenberg, Edward, "ABCDEFG . . . LEMME Unravel Kourtney Kardashian's Latest Supplement Fad," https://techingitapart.substack.com/p/abcdefg-lemme-unravel-kourtney-kardashians.

[6] Cesar T.B., Ramos F.M., & Ribeiro C.B., "Nutraceutical Eriocitrin (Eriomin) Reduces Hyperglycemia by Increasing Glucagon-Like Peptide 1 and Downregulates Systemic Inflammation: A Crossover-Randomized Clinical Trial," 25 J. of Medicinal Food 11 (Nov. 9, 2022), 1050–1058.

16.     These results are hardly surprising. The primary mechanism by which GLP-1 levels rise in the body is eating—the release of GLP-1 while eating that helps regulate satiety and slows gastric emptying. The resting concentration of active GLP-1 in the blood is between 5 and 10 pmol/L (picomoles per liter), which increases to approximately 50 pmol/L after eating, before breaking down.[7] As such, GLP-1 concentration in the blood increases by approximately 400% to 900% after eating. It is unsurprising, therefore, that a mere 17% increase in GLP-1 would have no discernable effect on caloric consumption, BMI, or weight loss.

17.     Comparing Lemme's claims with GLP-1 agonists that actually do have an effect on caloric consumption, satiety, and weight loss shows even more starkly the misleading nature of Defendant's claims of weight management benefits derived from a 17% increase in GLP-1. A 1 mg weekly dose of Ozempic or Wegovy results in a concentration of synthetic GLP-1 (semaglutide) in the blood of approximately 30,000 pmol/L.[8] As the resting concentration of GLP-1 in the blood is 5 to 10 pmol/L, the resting concentration of GLP-1 agonists in the blood is *300,000% to 600,000% greater*—and with a half-life of 7 days instead of 2 minutes, lasts more than 5,000 times longer in the body.

---

[7] Padidela, Patterson M., Sharief N., Ghatei M., Hussain K., "Elevated basal and post-feed glucagon-like peptide 1 (GLP-1) concentrations in the neonatal period," European J. of Endocrinology 2009 Jan 160:1: 53–58.

[8] Petri, K.C., Ingwersen, S.H., Flint, A., Zacho, J., Overgaard, R.V., "Semaglutide s.c. Once-Weekly in Type 2 Diabetes: A Population Pharmacokinetic Analysis," Diabetes Ther. 2018 Jun 15:9(4):1533–1547.

18. Defendant's misleading claims about Lemme GLP-1 Daily are not just on their website. On Lemme's Instagram page, Lemme cofounder Scott Huck claims that increasing natural GLP-1 with Lemme GLP-1 Daily "promotes fat loss + reduces hunger":



19. And in an interview posted on Lemme's Instagram page (a portion of which was also posted to Lemme's Facebook page), Huck (with Lemme cofounder Kardashian Barker by his side) trumpeted the supposed effect of Lemme GLP-1 Daily's alleged 17% increase in GLP-1 on weight management:

> Interviewer: What happens if you start taking the GLP-1 Daily, what will your body start to do:
>
> Huck: So, it's three clinically studied ingredients for weight management: so burning visceral fat, and then there's appetite control—so curbing sugar and carb cravings—and *arguably like the most important is it increases GLP-1 hormone naturally in your body without having to take a synthetic drug*. So we know that 70% of people who are taking GLP-1 medications stop after a year because of side effects because they don't want to take a drug, because they're also extremely expensive, and we have spent years getting this right and using ingredients that are really game changing.

20. Another reason that Defendant's advertisements are misleading is that, while they claim to have clinical support for the components of Lemme GLP-1 Daily, they did not study the combination of those extracts in a single supplement—meaning that the supplement has not been clinically tested. "[W]hile one could argue that research has occurred on these 3 active ingredients individually (ignoring the glaring problems with the quality of that work), no data has been made available regarding the combination of these agents in a single product."[9] Because compounds may have an effect on other compounds when taken in combination, the FDA does not consider over-the-counter medicines with multiple active ingredients to be safe and effective unless "combining of the active ingredients does not decrease the safety or effectiveness of any of the individual active ingredients[.]" 21 C.F.R. § 330.10 (a)(4)(iv).

21. And how much is this supposed wonder drug whose GLP-1 weight management effects have apparently eluded scientists, researchers, and multi-billion-dollar pharmaceutical companies for decades? A one-month supply costs $90, and if consumers subscribe, a six-month supply costs $378. Defendant tells consumers to take "[t]wo capsules a day, taken with food, to support your weight management goals," and—of course—the "best results" do not come without "consistent, daily use for at least 3-6 months."

---

[9] Munoz, Nini, and Nirenberg, Edward, "ABCDEFG . . . LEMME Unravel Kourtney Kardashian's Latest Supplement Fad," https://techingitapart.substack.com/p/abcdefg-lemme-unravel-kourtney-kardashians.

22. By falsely advertising that consumers purchasing Lemme GLP-1 Daily will see hunger and weight loss benefits from the supplement's alleged increase in GLP-1 levels, Defendant has violated New York deceptive trade practice and false advertising laws.

## JURISDICTION AND VENUE

23. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(d)(2)(a) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00 exclusive of interest and costs, there are over 100 members of the putative class, and at least one class member is a citizen of a state different than Defendant.

24. This Court has personal jurisdiction over Defendant because a substantial portion of the events that gave rise to Plaintiff's claims occurred in New York and Defendant is headquartered in New York.

25. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events that gave rise to Plaintiff's claims occurred in this District, Defendant maintains its corporate headquarters in this District, and Defendant's terms of service require that judicial proceedings be brought in this District.

## PARTIES

26. Plaintiff Christina Robins is a resident of the State of California. Ms. Robins first learned about Lemme GLP-1 Daily by watching an interview with Huck on Facebook or Instagram. After hearing the interview, Plaintiff went to lemmelive.com in September 2024 and read the claims about Lemme GLP-1 Daily's effect on GLP-1 production and weight management. Based on Defendant's false advertising, Plaintiff purchased a subscription to Lemme GLP-1 Daily. She took Lemme GLP-1 Daily as instructed for more than three months. Had she known that Defendant had no clinical basis to claim any hunger or weight loss benefits from the supplement's claimed increase in naturally occurring GLP-1 levels, she would not have purchased Lemme GLP-1 Daily or would have only been willing to purchase the supplement at a

lesser price. While on the supplement, she gained five pounds.

27. Defendant Lemme Inc. is a Delaware corporation that is headquartered in New York, New York.

## CLASS ALLEGATIONS

28. Plaintiff seeks to represent a class defined as all persons in the United States who, during the maximum period of time permitted by law, purchased Lemme GLP-1 Daily from [lemmelive.com](lemmelive.com) for personal, family, or household consumption, and not for resale (the "Class").

29. Excluded from the Class are Defendant and its parent companies, subsidiaries, and affiliates, as well as their respective officers, employees, agents, and affiliates. Also excluded from the Class is any judicial officer who presides over this action.

30. **Numerosity Fed. R. Civ. P. 23(a)(1)**. Members of the Class are so numerous that their individual joinder herein is impracticable. On information and belief, members of the Class number in the tens of thousands, if not more. The precise number of Class members and their identities are unknown to Plaintiff at this time but may be determined through discovery. On information and belief, Defendant keeps computerized records of their customers through which a significant majority of Class members may be identified and ascertained, and it maintains contact information through which notice of this action could be disseminated in accordance with due process requirements.

31. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2) and 23(b)(3))**. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact that exist as to all Class members and predominate over questions affecting only individual Class members include, but are not limited to:

    a. whether Defendant's marketing, advertising, packaging, labeling, and other promotional materials for Lemme GLP-1 Daily are deceptive and misleading;

    b. whether Plaintiff and members of the Class have suffered damages as a result of Defendant's actions, and the amount thereof;

  c. whether Defendant has been unjustly enriched as a result of the unlawful, fraudulent, and unfair conduct alleged in this Complaint such that it would be inequitable for Defendant to retain the benefits conferred upon Lemme Inc. by Plaintiff and the Class;

  d. whether Defendant made false and misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth;

  e. whether potential customers of Defendant are susceptible to future harm from Defendant's conduct; and

  f. whether Plaintiff and members of the Class are entitled to recover attorney's fees and costs.

32. **Typicality (Fed. R. Civ. P. 23(a)(3)).** The claims of the named Plaintiff are typical of the claims of the Class in that the named Plaintiff was exposed to Defendant's false and misleading marketing, purchased Lemme GLP-1 Daily, and suffered a loss as a result of those purchases.

33. **Adequacy (Fed. R. Civ. P. 23(a)(4)).** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of Class members will be fairly and adequately protected by Plaintiff and her counsel.

34. **Superiority (Fed. R. Civ. P. 23(b)(3)).** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of Class members. Even if every member of the Class could afford to pursue individual litigation, the court system could not. Individualized litigation would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also increase the delay and expense to all parties and would present the potential for varying, inconsistent, or contradictory judgments—magnifying the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. In contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents far fewer management difficulties and provides the benefits of single adjudication, economy of

scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues would ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues. Plaintiff anticipates no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT ONE

### Violation of the New York General Business Law § 349

35. Plaintiff realleges all of the allegations in prior paragraphs.

36. Plaintiff brings this cause of action on behalf of herself and Class members against Defendant.

37. Under the New York General Business Law ("GBL") Section 349, "[d]eceptive acts or practices in the conduct of any business, trade, or commerce" are unlawful.

38. Plaintiff and Class members are "persons" within the meaning of GBL § 349(h).

39. Defendant is a "person, firm, corporation or association or agent or employee thereof" within the meaning of GBL § 349(b).

40. Defendant misleadingly, inaccurately, and deceptively advertises and markets Lemme GLP-1 Daily to consumers. In doing so, Defendant has engaged in deceptive acts or practices in violation of GBL § 349.

41. Defendant's deceptive acts or practices were materially misleading in that it, inter alia, they induced Plaintiff and Class members to purchase Lemme GLP-1 Daily when they otherwise would not have or to pay a premium for Lemme GLP-1 Daily that they otherwise would not have.

42. Defendant's conduct was likely to and did deceive reasonable consumers, including Plaintiff, about Lemme GLP-1 Daily.

43. Plaintiff and Class members were unaware of, and lacked a reasonable means of discovering, material facts that Defendant failed to disclose.

44. Defendant's deceptive acts and practices occurred in the conduct of trade or commerce.

45. Defendant's deceptive acts and practices were directed at consumers.

46. Defendant's misleading conduct concerns widely purchased consumer products and affects the public interest. Defendant's conduct includes unfair and misleading acts or practices that have the capacity to deceive consumers and are harmful to the public at large.

47. Plaintiff and Class members suffered ascertainable loss as a direct and proximate result of Defendant's GBL violations in that: (i) they would not have purchased Lemme GLP-1 Daily had they known the truth; and (ii) they overpaid for Lemme GLP-1 Daily on account of the misrepresentations and omissions described herein. As a result, Plaintiff and Class members have been damaged either in the full amount of the purchase price of Lemme GLP-1 Daily or in the difference in value between Lemme GLP-1 Daily as warranted and as actually sold.

48. Defendant made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

49. By reason of the foregoing and as a result of Defendant's conduct, on behalf of herself and other members of the Class, Plaintiff seeks to enjoin Defendant's unlawful acts and practices described herein, to recover actual damages or fifty dollars, whichever is greater, treble damages, reasonable attorney's fees and costs, and any other just and proper relief available under GBL § 349.

## COUNT TWO

### Violation of the New York General Business Law § 350

50. Plaintiff realleges all of the allegations in prior paragraphs.

51. Plaintiff brings this cause of action on behalf of herself and Class members against Defendant.

52. GBL § 350 provides that "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

53. Defendant's advertising of Lemme GLP-1 Daily was false and misleading in a material way.

54. Defendant's misrepresentations and omissions were consumer-oriented and were likely to mislead a reasonable consumer acting reasonably under the circumstances.

55. Defendant's misrepresentations and omissions were, and continue to be, substantially uniform in content, presentation, and impact upon consumers at large.

56. These misrepresentations and omissions have resulted in consumer injury and harm to the public interest.

57. Plaintiff and Class members have suffered economic injury as a direct and proximate result of Defendant's GBL violations in that: (i) they would not have purchased Lemme GLP-1 Daily had they known the truth; and (ii) they overpaid for Lemme GLP-1 Daily on account of the misrepresentations and omissions described herein. As a result, Plaintiff and Class members have been damaged either in the full amount of the purchase price of Lemme GLP-1 Daily or in the difference in value between Lemme GLP-1 Daily as warranted and as actually sold.

58. Defendant made the untrue and/or misleading statements, omissions, and representations willfully, wantonly, and with reckless disregard for the truth.

59. By reason of the foregoing and as a result of Defendant's conduct, on behalf of herself and other members of the Class, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover actual damages or five hundred dollars, whichever is greater, treble damages, reasonable attorneys' fees and costs, and any other just and proper relief available under GBL § 350.

**PRAYER FOR RELIEF**

Plaintiff, on behalf of herself and the members of the proposed Class, seeks judgment against Defendant, as follows:

(a) For an order certifying the Class under Rule 23 of the Federal Rules of Civil

Procedure, naming Plaintiff as representative of the Class and naming Plaintiff's attorneys as Class Counsel;

(b) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(c) For compensatory, statutory, and treble damages in amounts to be determined by the Court and/or jury;

(d) For prejudgment interest on all amounts awarded;

(e) For an order of restitution and all other forms of equitable monetary relief;

(f) For an order enjoining Defendant from continuing its illegal practices and compelling Defendant to undertake a corrective advertising campaign; and

(g) For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: March 9, 2025

**WARREN TERZIAN LLP**

Thomas D. Warren

Thomas D. Warren (PHV motion forthcoming)
Dan Terzian (PHV motion forthcoming)
222 N Pacific Coast Hwy, Ste 2000
Los Angeles, CA 90245-5614
Telephone: (213) 410-2620
Email:  tom.warren@warrenterzian.com
            dan.terzian@warrenterzian.com

*Attorneys for Plaintiff*